IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:10-CV-406-FL

DARA SHOFFNER,                          )
                                        )
                  Plaintiff,            )
                                        )
        v.                              )
                                        )                    ORDER
TALECRIS BIOTHERAPEUTICS, INC.,         )
and ALDO PEREZ, in his individual and   )
official capacity,                      )
                                        )
                  Defendants.           )


        This matter comes before the court on defendants' motion for summary judgment (DE # 21).

Plaintiff responded in opposition, and defendant filed a reply. In this posture, the issues raised are

ripe for review. For the following reasons, the court grants defendants' motion for summary

judgment.

## STATEMENT OF THE CASE

        On October 1, 2010, plaintiff commenced this action by filing a complaint with this court.

Plaintiff's complaint alleges four causes of action: 1) that defendants[1] discriminated against her on

the basis of her sex, race, and color, in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e *et seq.*, by failing to promote her on multiple occasions; 2) that defendants

---

[1] Following a recent acquisition and merger, defendant Talecris Biotherapeutics, Inc., is now known as Grifols Therapeutics, Inc. Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") 1 n.1. Because the facts essential to disposition of this matter occurred prior to the recent merger and acquisition, the court will refer to the corporate defendant as "Talecris" throughout this order. Defendant Aldo Perez was an executive employee of Talecris at all times relevant to this matter, having possessed the titles Manager of Sales Operation Analysis and Reporting, Director of Financial Planning and Analysis, and Director of Finance. Deposition of Aldo Perez ("Perez Dep.") 12, ex. 3 to Defs.' Mem.

discriminated against her with respect to her compensation, terms, conditions or other privileges of employment because she is female, in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); 3) that defendants subjected her to unequal treatment based upon her race, in violation of 42 U.S.C. §§ 1981 & 1983; and 4) that defendants retaliated against her after she complained of unlawful discrimination, in violation of Title VII.

On December 13, 2010, defendants answered the complaint, denying liability. Following discovery, defendants filed a motion for summary judgment on October 17, 2011. Plaintiff responded in opposition, arguing that she has established a *prima facie* case with respect to each of her claims, and that any reasons given by defendants for their adverse employment actions are pretextual. Defendants timely replied.

## STATEMENT OF THE FACTS

The undisputed facts, viewed in the light most favorable to plaintiff, are as follows. Plaintiff is an African-American female of brown skin color. Plaintiff began working at Talecris[2] in the latter portion of 2007, as a Senior Business Analyst. Deposition of Dara Shoffner ("Shoffner Dep.") 11-13, ex. 4 to Defs.' Memo. At the time of her hiring, plaintiff's position was at the M-9 grade level[3] with a salary of $95,000.00 per year. When she was hired, plaintiff believed she would be working under and reporting to Laine Atchison. However, when plaintiff began working, Atchison had

---

[2] According to defendants, "Talecris discovers, develops and produces critical care medical-related products in a variety of therapeutic areas including immunology, pulmonology and hemostasis." Defs.' Mem. 2.

[3] Talecris utilizes a "banded" employee grade/level structure, in which employees are assigned to a particular band based upon different factors pertaining to their job. Much of the subject matter of this suit concerns defendants' decisions not to "re-scope" plaintiff's position and place it in the higher-level "E" band or otherwise promote her to vacant positions in the E band. Perez's position was in the E band. There are multiple levels within each band, which ascend from a lower to a higher number as the employee is promoted within the band. According to Plaintiff, "E1 level managers report directly to directors and/or senior directors. A M9/M10 level job reports directly to an E-level position." Affidavit of Dara Shoffner ("Shoffner Aff.") ¶ 4, ex. 1 to Pl.'s Resp. in Opp ("Pl.'s Resp.").

2

departed and Cheryl Koepke (white female) had assumed the role of Senior Manager Finance - Global Operations. Plaintiff began reporting directly to Koepke. Plaintiff states that her job, ostensibly, "was to assist the manager in the financial planning and analysis activities for the international commercial operations team." Shoffner Dep. 13. However, plaintiff avers that in reality she "immediately took on the managerial role for the ICON business[4] in addition to managing the Global Demand Planning groups. The work I was performing was managing and not assisting as I was hired to do and took on some of the responsibilities that the Senior Finance Manager was expected to do." Shoffner Aff. ¶ 6.

Approximately seven or eight months after plaintiff began at Talecris, the reporting structure was reorganized such that Koepke began directly reporting to Perez (Hispanic male). Shortly after this change, Koepke resigned and plaintiff began reporting directly to Perez. Talecris posted a hiring notice for Koepke's position, and plaintiff applied. However, plaintiff was informed that she would not be offered the position. Ultimately, Talecris determined not to fill Koepke's vacated Senior Manager position. Instead, the company divided some of Koepke's duties among plaintiff and contract employees, first Ann Norstag (white female) and then Jack Fan (Asian male), while other responsibilities, specifically the "trusted business partner" aspect of Koepke's position, were left unfulfilled. Perez Dep. 43-46, 51-53; see also Shoffner Dep. 63-66; Compl. ¶¶ 19-20 ("Instead

---

[4] "ICON" represents that portion of Talecris customers residing in countries other than the United States, Canada, or Germany. Shoffner Aff. ¶ 1.

of filling the vacancy with a company employee, defendant Talecris chose to place an outside contractor Jack Fan. Jack Fan did not take on the responsibilities formerly held by Laine Atchison.").[5]

After plaintiff was denied the Senior Manager position, she approached Perez sometime in the latter part of 2008 and requested that her position be elevated to the E-1 level based on the enhanced duties she believed she was performing. Perez Dep. 58-59; Shoffner Dep. 71. Perez conveyed to plaintiff that he believed her position was properly "scoped," but he also referred the matter to human resources to review and "recommend whether or suggest whether some action needed to be taken . . . ." Perez Dep. 62. Perez did not provide human resources with a revised job description accounting for plaintiff's purported enhanced duties during this review. Human resources determined after its investigation that plaintiff's position was properly scoped at that time.

Later, around April, 2009, plaintiff again approached Perez to request that her position be re-scoped at the E-1 level. Perez Dep. 78. Perez agreed with plaintiff that the scope and importance of her work in ICON had increased such that her position should be reevaluated. Id. However, the formal process of rescoping plaintiff's position did not occur until later in the year, around October.[6] At that time, plaintiff's job title was changed to International Finance Manager, and her grade level was increased to M-10, the highest level of the M band. Shoffner Dep. 22-25. Commensurate with

---

[5]  Talecris eventually hired Fan as a regular employee. Perez Dep. 94.

[6]  Mike Haddock (African-American male), the company's compensation specialist, testified that around that time he was presented with the task of analyzing the compensation for both plaintiff's and Fan's positions. Deposition of Mike Haddock ("Haddock Dep.") 45-46, ex. 6 to Defs.' Mem. Haddock was provided job descriptions for the two positions and met with Perez and Lee Ruderman (white male), a human resources business partner, to exchange information and discuss the positions in light of the job descriptions and his own market analysis. Id. at 47-49. After Haddock completed his evaluation, both plaintiff and Fan received promotions.

her promotion, plaintiff's salary increased to $105,700 per year,[7] and she was eventually awarded a one-time bonus in order to effectively back-date her pay raise to April of 2009. Shoffner Dep. 95-96.

Nevertheless, after her promotion plaintiff persisted in her belief that her position should be graded at the E-1 level. When plaintiff conveyed this to Perez and/or Ruderman, as well as her belief that she had been denied the E-1 grade due to discrimination, a meeting was scheduled to discuss the matter. Plaintiff, Perez, Ruderman, Haddock, and Perez's supervisor, Keith Kosinski (white male) attended the meeting. Perez Dep. 113-16; Shoffner Dep. 78-79, 90. At the meeting, plaintiff articulated why she believed her position, even after the promotion, was not graded at the appropriate level. Haddock advised plaintiff of his "evaluation process . . . and gave her the explanation of how the process was done and where things landed based on the market data." Haddock Dep. 55.[8] According to Haddock, plaintiff stated that she believed her compensation was fair, but that her real concern was with the grade level of her position. Id. at 54, 57-58. Haddock and the executives concluded that plaintiff's position was compensated appropriately and scoped at the appropriate grade level.

Plaintiff appealed this decision by writing a letter to Suzanne Johnson (white female), the Senior Human Resources Manager.[9] In the letter, plaintiff explained that she felt she was denied

---

[7] A document which appears to list the Talecris employees who reported to Perez as of April 15, 2010, indicates that plaintiff's salary was $106,704 per year. See Ex. 6 to Pl.'s Resp.

[8] Haddock explained at his deposition that his task in reviewing plaintiff's compensation required him to consider various elements of her job description, tasks, responsibilities, required knowledge, decision making, scope and complexity, and to compare those aspects with market data consisting of "research survey data" from other companies performing similar functions in the biotechnology industry. Haddock Dep. 60-61.

[9] Johnson testified at her deposition that the complaint process for a Talecris employee aggrieved by some decision was progressive in the sense that the employee went "[t]o the supervisor, to the manager, and then to HR, and (continued...)

a promotion to the E-1 level due to discrimination against her on the basis of her race, color, and gender. Johnson investigated the matter by speaking with plaintiff about her concerns, as well as speaking with Ruderman, Perez, and Haddock about what happened and the bases for the decision not to grade plaintiff's position at the E-1 level. Johnson Dep. 39-46. Johnson also reviewed documents submitted to her by plaintiff. Id. at 47-48. After completing her review, Johnson informed plaintiff that she could not "see anything that substantiates a concern for discrimination." Feb. 15, 2010, Email from Johnson to Shoffner, ex. 4 to Pl.'s Resp. Plaintiff then requested the final level of appeal, review by the Vice President of Human Resources.

In 2010, Talecris decided to create a position in order to fill the void–namely the "trusted business advisor for all of the international groups"–caused by the decision not to hire a full replacement for Koepke at the time of her departure. Perez Dep. 46.[10] Talecris posted a position titled Senior Manager Finance - International FP&A. Plaintiff applied for this position, but was not given an interview. Ultimately, Talecris decided to transfer a long-term employee from a separate division, Bob Brown (white male), into a position that would address this need and came to be titled Director of International Finance. Brown Dep. 21-22. Brown's prior position in the plasma division was encompassed in a reduction-in-force and restructuring initiative, and he was offered the senior international finance position in order to avoid a job loss. Id. at 17-18; Perez Dep. 46-47. After Brown started in the new position, the reporting structure was reorganized such that plaintiff and Jack Fan began reporting to Brown, who in turn reported directly to Perez. Perez Dep. 47-48.

---

[9](...continued)
then it goes to the HR leader, and then the vice president." Johsnon Dep. 27-28, ex. 8 to Defs.' Mem. See also Employee Complaint Procedure, ex. 4 to Pl.'s Resp.

[10] Perez testified that, in reality, this aspect of Koepke's job "really didn't quite get done when Cheryl was onboard . . . ." Perez Dep. 45.

By the time plaintiff gave her deposition in this case she had resigned from her position with Talecris. Shoffner Dep. 25-26. Plaintiff claims that, as a result of the defendants' actions, she "was humiliated embarrassed and degraded and as a consequence, plaintiff endured mental anguish and continues to suffer mental anguish and distress and is otherwise adversely affected as a result of the callous indifference to plaintiff's rights to be treated equally and fairly and not to be discriminated against." Compl. ¶ 36.

## DISCUSSION

A.      Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). A "material" fact is identified by the substantive law, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not simply rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248-49, but instead "must come forward with specific facts showing that there is a *genuine issue for trial*." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original and quotation omitted).

In determining whether a genuine issue of material fact exists for trial, a trial court views the facts and reasonable inferences drawn from the parties' submissions in the light most favorable to

the nonmoving party. <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. <u>Anderson</u>, 477 U.S. at 249-250 (citations omitted) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."); <u>id.</u> at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient . . . .").

B.      Analysis

1.      Plaintiff's Title VII, § 1981, and § 1983 discrimination claims

Plaintiff claims that she "was denied a promotion and commensurate benefits in her employment with Talecris," and that the denials of such a promotion "constitute unlawful discrimination . . . against plaintiff because of plaintiff's sex, race and color." Compl. ¶¶ 40, 43. Thus, plaintiff alleges a failure-to-promote claim premised on Title VII, § 1981, and § 1983.[11]

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

> Generally speaking, a plaintiff may avert summary judgment and establish a claim for intentional . . . discrimination through two avenues of proof.

---

[11]  "The elements of a claim under § 1981 or § 1983 mirror those of Title VII[,]" <u>McCray v. Pee Dee Reg'l Transp. Auth.</u>, 263 F. App'x 301, 305 (4th Cir. 2008), and courts therefore analyze discrimination claims premised on these provisions of law by applying the same legal framework. <u>See</u> <u>Bryant v. Bell Atl. Md., Inc.</u>, 288 F.3d 124, 133 n.7 (4th Cir. 2002). Of course, § 1983 carries with it the additional requirement that the alleged discrimination be carried-out by someone acting under color of state law. Plaintiff's lone allegation supporting her claim that defendants are state actors for purposes of § 1983 is that "Defendant is the recipient of governmental monies for research and the actions of defendants are taken under the authority of state law." Compl. ¶ 51. Plaintiff does not explain the amount, origin, or any other relevant circumstance concerning defendant's alleged receipt of "governmental monies," but it has long been recognized that merely receiving money from the state government, even "substantial funding," is insufficient to invoke liability under § 1983. <u>Dowe v. Total Action Against Poverty in Roanoke Valley</u>, 145 F.3d 653, 659 (4th Cir. 1998). Rather, the state must be so involved with the personnel decision that a court can find that the state controlled the relevant decision maker or otherwise compelled the decision. <u>Id.</u> Ultimately, the court need not decide whether defendants are subject to liability under § 1983 because the court finds that defendants are entitled to summary judgment on the merits of plaintiff's discrimination claims, regardless of whether those claims are considered under Title VII, § 1981, or § 1983.

First, a plaintiff may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that . . . [unlawful] discrimination motivated the employer's adverse employment decision. The employee, however, need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor. In such cases, historically referred to as "mixed-motive" cases, it is sufficient for the individual to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons.

. . .

The second method of averting summary judgment is to proceed under a "pretext" framework [as set forth in the Supreme Court's seminal case <u>McDonnell Douglas Corp. V. Green</u>, 411 U.S. 792 (1973)], under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination. . . . If a prima facie case is presented, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Assuming the employer meets this burden of production, . . . the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination. At this point, the burden to demonstrate pretext merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination. Thus, the <u>McDonnell Douglas</u> framework serves to bring the litigants and the court expeditiously to this ultimate question.

<u>Hill v. Lockheed Martin Logistics Mgmt., Inc.</u>, 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc) (internal citations and quotation marks omitted).

Plaintiff relies upon the "second method" to avert summary judgment. <u>See</u> Pl.'s Resp. 9-10 ("Plaintiff has a prima facie case of discriminatory failure to promote and she has sufficient evidence that the employer's proffered business reasons are pretextual, primary [sic] because the justifications are based upon false information, inconsistencies in the process to fill vacancies and to grant promotions and the reasons are unsupported by the evidence. Accordingly the business reason given is a subterfuge for discrimination."). Thus, the court will utilize the burden shifting framework of <u>McDonnell Douglas</u> in analyzing plaintiff's claims. Pursuant to this framework, plaintiff must first establish a *prima facie* case with respect to each of her claims that she was denied a promotion

9

because of her "sex, race, and color." Compl. ¶ 43.

To establish a *prima facie* case of failure to promote under Title VII, plaintiff is required to show that: (1) she is a member of a protected group; (2) she applied for a specific position; (3) she was qualified for the position; and (4) she was rejected "under circumstances that give rise to an inference of discrimination." Williams v. Giant Food, Inc., 370 F.3d 423, 430 (4th Cir. 2004).[12] If plaintiff is able to establish a *prima facie* case with respect to any of her failure-to-promote claims, defendants must then produce evidence that any adverse employment decision was supported by legitimate, nondiscriminatory reasons. This "burden is one of production, not of persuasion." Williams v. Staples, Inc., 372 F.3d 662, 668 (4th Cir. 2004). The court is not charged with evaluating the soundness of the employer's decision. See Muhammad v. Giant Food, Inc., 108 F. App'x 757, 765 (4th Cir. 2004) ("When courts are evaluating the legitimacy of the employer's stated reason for the employment action, the question is not whether the employer's stated reason was a good business decision, but whether the stated reason was the real reason.").

If defendants satisfy their burden of producing legitimate, nondiscriminatory reasons for their actions, the burden shifts back to plaintiff to "demonstrate by a preponderance of the evidence that the reason articulated by [defendants] was not its true reason for [deciding not to promote plaintiff] but was instead a pretext for . . . discrimination." Id. at 669. In the face of "substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action," the plaintiff cannot rely merely on her "own assertions of discrimination." Adams v. Trustees of the University of N.C.-

---

[12] The Fourth Circuit has previously held that, in order "to satisfy the fourth prong, [a plaintiff] need only show that the position was filled by a . . . applicant [outside the plaintiff's protected class]." Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994). Hence, the Fourth Circuit recently stated, in an unpublished opinion, that a plaintiff may establish *prima facie* case by showing that the position for which she applied and was rejected "remained open or was filled by similarly qualified applicants outside the protected class." Williams v. Carolina Healthcare System, Inc., __ F. App'x__, __, 2011 WL 5148971, *1 (4th Cir. Nov. 1, 2011) (citing Page v. Bolger, 645 F.2d 227, 229-30 (4th Cir. 1981)).

10

<u>Wilmington</u>, 640 F.3d 550, 560 (4th Cir. 2011). Plaintiff can meet part of her burden by "showing that [defendants'] proffered reason is not worthy of belief." <u>Id.</u> In the failure to promote context, a plaintiff "can prove pretext by showing that [s]he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." <u>Heiko v. Colombo Savings Bank, F.S.B.</u>, 434 F.3d 249, 259 (4th Cir. 2006).

Importantly, however, it is not enough to simply present evidence impugning the veracity of the defendant's proffered reason for its adverse employment decision. The plaintiff must adduce some evidence supporting her theory that discrimination was the actual basis for the adverse employment decision. <u>See</u> <u>Love-Lane v. Martin</u>, 355 F.3d 766, 788 (4th Cir. 2004) (internal quotations and citations omitted) ("Simply because Love-Lane presents evidence that the defendants' justification for their adverse employment decision may be false does not mean that Love-Lane's evidence demonstrates pretext for race discrimination. The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that [Love-Lane's] proffered reason . . . is correct. It is not enough to disbelieve the defendants here; the fact-finder must believe Love-Lane's explanation of intentional race discrimination.").

Plaintiff maintains that there are four instances in which she was denied a promotion due to discrimination. Pursuant to the standards articulated above, the court will examine each of these claims in turn.

    a.   Plaintiff's application for Koepke's vacated Senior Manager position

Plaintiff first claims that the rejection of her application for Koepke's vacated Senior Manager position was the product of intentional discrimination. She asserts that she has met her

*prima facie* burden because "she is a member of a protected group as a black female with brown skin. She applied for the vacancy and was qualified for the position. The rejection of plaintiff was not based upon her not meeting the job qualifications and after their rejection of plaintiff, defendants continued to seek applicants." Pl.'s Resp. 10.[13] Defendants contend that this claim fails because Koepke's position was left vacant. Defs.' Reply 2-3. Defendants' reasoning, presumably, is that, as to the *prima facie* aspect, because the Koepke position was not filled, plaintiff has failed to show that she was rejected under circumstances permitting an inference of discrimination. Moreover, the reasoning follows, defendants' ultimate decision to split some of the duties of the position between plaintiff and a contract employee rather than hire a full replacement for Koepke constitutes a legitimate, nondiscriminatory reason for the decision to not offer plaintiff the position which was not pretext for discrimination.

At the outset, it is important to note that plaintiff's contention that "Aldo Perez was notified of the vacancy and he filled it with a temporary employee, a white female, Ann Norstog," Pl.'s Resp. 10, is incorrect. While Talecris did hire a contract employee to take over some aspects of Koepke's position, it is undisputed that Talecris did not hire a full replacement for Koepke or place anyone else in her position. Even plaintiff acknowledged this in both her complaint, Compl. ¶ 20, and at her deposition. See Shoffner Dep. 68. Thus, plaintiff cannot meet her *prima facie* burden simply by pointing to defendants' hiring of a contract employee outside of her protected class.

After Koepke decided to resign her position, defendants were grappling with considerable uncertainty about how to fill her position or otherwise restructure current employees. See Koepke

---

[13] In support of her contention that the vacancy remained open after her rejection, plaintiff has submitted an email from human resources at Talecris thanking her for applying but advising that Talecris had "decided to pursue other candidates who are better suited for this position." Sept. 19, 2008, email to Shoffner, attach. E to Shoffner Aff.

Aff., ex. 3 to Pl.'s Resp.  For example, Koepke states that when she gave her two-week notice of resignation, "Aldo hired a contract person and asked that I transfer all my work to both her and Dara. He said that Dara would be taking some of my responsibilities. . . .  Upon leaving, I told Aldo that he should consider Dara for my position, but he said that he wasn't sure how he would be restructuring it."  Id. at 2.  Likewise, Perez testified at his deposition that Talecris "pretty quickly" "brought in a temporary contractor who actually only took a portion of Cheryl's role."  Perez Dep. 43, 42.  Perez also testified that, after hiring the contract employee, he did not fill Koepke's trusted business advisor responsibility because he "[d]idn't have the head count."  Id. at 51.

Thus, while plaintiff may have actually been rejected in her application for Koepke's position, it is apparent from the record that, even before Koepke left, Perez had already determined that certain responsibilities of Koepke's position would be split between plaintiff and a new contract employee.  This decision, no matter how unwise plaintiff might deem it in light of Koepke's or her own assessment of her qualifications and readiness to succeed in Koepke's full role, does not suggest intentional discrimination such that plaintiff's *prima facie* burden is satisfied.  Moreover, even assuming that the circumstances surrounding the decision not to offer plaintiff Koepke's position could give rise to an inference of discrimination, defendants have proffered legitimate, nondiscriminatory reasons for that decision–they were unsure at first how to fill Koepke's position but ultimately decided not to hire a full replacement and instead split some of her duties among lower-level employees, including plaintiff, while other responsibilities went unfulfilled for some time.

Plaintiff has not carried her corresponding burden to demonstrate by a preponderance of evidence that this reason is not worthy of belief.  To show pretext, plaintiff asserts that she "was not

13

given an interview which was an irregular process negating the business justification stated by Defendants. An interview of internal applicants is the normal procedure." Pl.'s Resp. 11. First, plaintiff points to no policy or other source of authority for her contention that defendants were required as part of some "normal procedure" to interview her for the position merely because she was an internal applicant.[14] Instead, she relies upon defendants' response to her second EEOC charge, which was concerned with her belief that she had been rejected for a different promotion–the Bob Brown position–nearly two years after she applied for the Koepke position. In that document, defendants stated simply that they had not yet filled that position, were unsure when and whether it would be filled, but that, "[a]t such time as the decision is made to commence interviewing individuals [for the position], Ms. Shoffner will be given the same opportunity to interview for the role as any other internal applicant." Ex. 6 to Pl.'s Resp. at 8.

This statement, standing alone, simply does not suffice to show, by a preponderance of evidence, that defendants failed to adhere to some "normal procedure" in declining to grant plaintiff an interview, nearly two years earlier, for a separate position for which they considered plaintiff insufficiently qualified. Likewise, even if a mandatory interview were the "normal procedure," the fact that defendants were clearly unsure of how the position would be filled, and indeed decided not to hire a true replacement for Koepke, confirms that the decision not to interview plaintiff was not so "irregular" as to demonstrate that the decision to not promote plaintiff was the product of discrimination. Accordingly, plaintiff has failed to show that defendants' proffered legitimate, nondiscriminatory reasons for declining to promote her to Koepke's vacated position are pretext for

---

[14] Plaintiff also does not claim that any other applicant received an interview for the position, including Jack Fan.

discrimination, and defendants are entitled to summary judgment as to this claim.[15]

> b.    Plaintiff's requests to be promoted to the E-1 level outside of a specific vacancy

Plaintiff's second and third claims that she was discriminatorily denied promotions concern her requests, in late 2008 and approximately mid 2009, respectively, that she be promoted from the M-9 level to the E-1 level based on her perception that her actual work exceeded the scope of her job description and was worthy of the E-1 level. Although plaintiff was not applying for a specific open vacancy with these requests, she was requesting that her position be re-scoped in order to embrace all of her duties and responsibilities and adjust her grade level accordingly. Defendants do not argue that plaintiff has failed to meet the "application" prong of the *prima facie* test. Rather, defendants contend that plaintiff "cannot establish the third and fourth elements of the *prima facie* case." Defs.' Mem. 10. Thus, the court will assume for purposes of this claim that plaintiff has satisfied the requirement that she applied for a specific position.

As for plaintiff's late 2008 "application" for promotion to the E-1 level, plaintiff claims that "Aldo Perez engaged deceit in not providing Plaintiff's full responsibilities to Human Resources for an appropriate level increase. Aldo Perez's false statements of Plaintiff's qualifications were deliberately done to prevent the appropriate promotions." Pl.'s Resp. 11. However, plaintiff does not point to a Talecris policy that would required Perez to provide a revised description of plaintiff's job requirements in 2008, particularly one with which he did not agree, in order to accommodate the

---

[15]  Plaintiff also presents as a material fact issue worthy of averting summary judgment the dispute as to whether Koepke actually advised Perez to consider promoting plaintiff to Koepke's position upon her resignation. Pl.'s Resp. 11. However, whether or not Koepke actually advised Perez to promote plaintiff is immaterial to the disposition of this claim because it does not bear on the court's pretext analysis and therefore would not affect the resolution of the issue under governing law. Koepke's opinion about plaintiff's fitness for a position that ultimately went unfilled does not sufficiently impugn the legitimate, nondiscriminatory reason given by defendants for failing to promote plaintiff into that position.

review undertaken by human resources. Nor does plaintiff point to any evidence that Perez actually made "false statements" about plaintiff's job requirements, whether of his own volition or in response to inquiries from human resources. The most that can be established in the record before the court is that Perez gave plaintiff his opinion that her position was properly scoped but nonetheless referred the matter to human resources. Plaintiff herself submitted a job description to Perez, who then provided it to human resources to aid in the review. See October 31, 2008, email from Dean to Caldwell, ex. 6 to Lopez Dep. ("Dara recently provided to Aldo a copy of the job posting that Kathleen did when Dara was hired. The language in this posting is not an exact match of the position description the Compensation team has in the 'old' database."). Perez did not prepare a new job description for plaintiff at that time because he did not believe that plaintiff's work exceeded the scope of her job based on their conversations about the issue. Lopez Dep. 60-61, 67-68. Nor did Perez prepare either the old job description or the one provided by plaintiff and passed by him to human resources.

Thus, the court is at a loss to discern the "deceit" and "false statements" plaintiff imputes to Perez. While Perez did not prepare a new job description in 2008 which incorporated all of the factors plaintiff believed entitled her to a promotion to E-1, plaintiff points to no evidence demonstrating that he was required to essentially advocate plaintiff's position to human resources despite his own contrary judgment on the matter. Nor has plaintiff demonstrated that Perez's belief that plaintiff did not warrant a promotion to E-1 was based on anything other than a legitimate, nondiscriminatory business judgment.[16] Plaintiff does not assert, for instance, that she prepared a

---

[16] Plaintiff appears to argue, on the separate issue of pretext, that Perez's "using only Plaintiff's entry job description on file with HR" during the 2008 scoping request lacked "sincerity" and therefore illustrates that his judgment that plaintiff was not qualified for promotion to the E-1 level was pretext for discrimination because,
(continued...)

16

separate document describing her enhanced duties which she also provided to Perez but which he then failed to forward to human resources or that he otherwise thwarted her own independent efforts, if any, to advise human resources of any purported enhanced duties. Nor does plaintiff point to evidence that Perez actually misled any human resources personnel by providing false information in response to any inquiries from that body during its review. Because plaintiff has not established some clear obligation of Perez to present specifically her arguments to human resources, or that he affirmatively misled human resources, the court finds no evidence that Perez deceived human resources to prevent any appropriate promotion of plaintiff in 2008.

Finally, there is no evidence in the record, other than plaintiff's own conjecture, linking Perez's omission of a description of what plaintiff regarded as her true duties with some supposed racial or gender animus on the part of Perez. With no evidentiary link more substantial than her own conjecture, plaintiff has failed to establish a *prima facie* case. Adams, 640 F.3d at 559 ("There must be some additional tie to a [prohibited] motive for the decision not to promote him and Adams failed to make that showing. . . . Adams' conjecture links the two, but nothing more substantial does.").[17]

---

[16](...continued)
purportedly, her actual "role was much greater" than that described in the job description. Pl.'s Resp. 12. Thus, plaintiff appears to be asserting that Perez did not actually believe that plaintiff was not qualified for promotion to the E-1 level. As proof, plaintiff relies upon a personnel evaluation completed by Perez some three months after the 2008 review, in which he remarked that "Throughout the year Dara began to embrace the needs of the international groups beyond ICON." Even if the court were to reach the issue of pretext, this argument is unavailing. Perez's observation is too vague to ascribe to it the weight given by plaintiff. Perez's one-sentence assessment of plaintiff's performance with respect to just one of several competencies listed on the evaluation is simply insufficient in detail or breadth to consider it a supposed repudiation of the opinion he expressed to plaintiff. Furthermore, plaintiff has not shown that her "embrace" of "the needs of the international group beyond ICON" was not contemplated by her job description or that it was so in excess of her job description as to warrant special commendation to human resources during the 2008 review.

[17]  In Adams, the Fourth Circuit specifically rejected the plaintiff-appellant's argument that an inference of discrimination was justified because Adams was the only "Christian conservative" in his department not to have received a promotion. 640 F.3d at 558. The court held that something more than such naked speculation was required in order to connect the decision to not promote and the protected characteristic. In this case, Plaintiff repeatedly asserted at her deposition that the primary "evidence" giving rise to her belief that she was discriminated against was that she was the

(continued...)

17

There is no evidence in the record that plaintiff was denied a promotion in 2008 under circumstances giving rise to an inference of intentional discrimination. Thus, plaintiff has failed to satisfy her burden of demonstrating a *prima facie* case of discrimination in the failure to promote her in 2008.

Plaintiff also claims that the decision to not promote her to the E-1 level upon her request in 2009 was the product of intentional discrimination. Defendants maintain that plaintiff cannot establish the third and fourth prongs of the *prima facie* inquiry with respect to this claim and that, even if she could, she cannot show that defendants' reasons for declining to promote her to the E-1 level are pretextual. Plaintiff presents a number of circumstances concerning Perez's handling of her 2009 request for a promotion which, for her, demonstrate that the decision to not promote her was discriminatory, and that defendants' proffered justification is pretext for discrimination. These circumstances include the following: 1) that, contrary to defendants' representations before the EEOC, it was Perez, not Haddock, who ultimately determined that plaintiff should be promoted to the M-10 level rather than E-1; 2) that Perez promoted another employee, Sam Talerico, to the E-1 level merely because that employee reported directly to Perez, yet he did not promote plaintiff to

---

[17](...continued)

only "African-American black female that works for Aldo Perez" and was the only direct report to Perez that was not an E-1 level employee. Shoffner Dep. 62; id. at 69. Such testimony is consistent with Suzanne Johnson's testimony that, in her meetings with plaintiff, plaintiff could not articulate any "specific examples . . . of why she felt discriminated." Johnson Dep. 32, 39-40.

To the extent plaintiff does manage to provide any "specific examples" of Perez's purported discriminatory animus in her submissions to the court, it is limited to her claim that Perez "often used words as 'limited' and 'little' to describe my work and effort which has a negative connotation of inferiority. He would also communicate that I would provide 'a little more color'. This indicates his consciousness of my skin color and that my value to him was only mediocre, regardless of the level of difficulty and effort I put forth." Shoffner Aff. ¶ 12. Plaintiff points to no specific instance in which Perez purportedly belittled her work or her contribution to Talecris, and she grossly exaggerates the context of Perez's email in which he remarked that plaintiff could "provide 'a little more color.'" In the email, which Perez copied to plaintiff, he was attempting to explain to a Senior Financial Analyst that plaintiff "should be able to provide you with a little more color" on the reasons for a variance between certain commission expenses on international sales from one year to the next. It is evident that, in its proper context, Perez was conveying that plaintiff should be able to better describe the reason for the variance. In other words, Perez was using "color" interchangeably with "detail." Any contention that this remark illustrates Perez's purported discriminatory animus against plaintiff is unwarranted, and plaintiff's attempt to steep this plainly innocuous remark outside its proper context and deem it probative of Perez's discriminatory animus fails.

the E-1 level despite the fact that she too once reported directly to Perez; 3) that Perez did not put a proposed grade level on plaintiff's job description when he submitted it for re-scoping in 2009, despite the fact that he had included proposed grade levels on other job descriptions when those positions were reevaluated; and 4) that Perez "engaged in deceit" by preparing and presenting a chart at the 2009 meeting which compared plaintiff's responsibilities with those of Peter Eisenberg, thereby causing the attendees to believe that Eisenberg's unique job description and duties were typical of all E-1 level employees when, in fact, there are no such typical requirements for the E-1 level. Pl.'s Resp. 12-14. The court will examine each of these arguments in turn.

Plaintiff's first contention is that "[p]retext can be inferred from an employer's inconsistent explanations for job actions." Id. at 12. She then states that, while Talecris represented to the EEOC that Haddock, not Perez, determined that plaintiff should be graded at the M-10 level, "Defendants' evidence discloses that it was Aldo Perez who instructed Haddock to place Plaintiff at the M-10 level." Id. Unfortunately, plaintiff does not actually cite to any piece of the record in support of this claim, leaving the court to surmise what part of "Defendants' evidence" supposedly proves that Perez was manipulating Haddock in order to ensure that he would place plaintiff at the desired level. The job description reviewed by Haddock during the re-scoping process was actually provided to him by Ruderman. See October 2, 2009, email from Ruderman to Haddock, ex. 6 to Pl.'s Resp. Although the description was prepared by Perez, the involvement of a human resources intermediary, against whom plaintiff does not allege any bias or discriminatory animus, and who clearly reviewed the description and endorsed its accuracy, mitigates plaintiff's concerns about Perez's "deceit" and "bad faith."

Plaintiff further appears to assert as evidence of Perez's manipulation of Haddock and the

re-scoping process the fact that the job description he prepared did not include a proposed grade level. She argues that in other instances, including for the description he simultaneously submitted involving Jack Fan's position, he included such proposed grade levels. Plaintiff attributes particular significance to Perez's omission because in the email in which Ruderman provided the job descriptions to Haddock, he remarked that "we [Ruderman and Perez] think the role scope and complexity has increased to the point that the job merits a re-evaluation to M10." Id. Plaintiff vastly overstates the character and significance of this email. It neither "direct[s Haddock] as the compensation specialist assigned to the promotion to reevaluate the position to only the M-10 level," Pl.'s Resp. 4, nor "discloses that it was Aldo Perez who instructed Haddock to place Plaintiff at the M-10 level." Id. at 12. Rather, it represents, at most, Ruderman's, and presumably Perez's, mutual agreement that plaintiff's role was greater than its scoping and that it should be reevaluated one level higher. Haddock confirmed at his deposition that it was his responsibility to finally determine the proper grade level of plaintiff's position, that it would be abnormal for a position being reevaluated to receive a promotion of more than one level, that, at most, Perez could only recommend a proposed grade level,[18] and that, whatever Perez's influence over the process, plaintiff had the opportunity to present her argument that she should be graded at the E-1 level directly to Haddock, Ruderman, and Kosinski at the meeting. Haddock Dep. 48, 53-56. Given all of these circumstances, plaintiff's apparent claim that Perez was manipulating Haddock and the re-scoping process in order to prevent her from receiving a promotion to the E-1 level is unavailing, as is her claim that Perez's omission of the proposed grade level somehow demonstrates pretext.

---

[18] The form at issue makes clear that the manager's submission of a pay-grade level when requesting a position reevaluation is a proposal. See Position Description Request Form, ex. 6 to Pl.'s Resp. (space for "Proposed Pay Grade" left vacant).

Plaintiff next appears to argue that the promotion of Sam Talerico to the E-1 level constitutes evidence of pretext because the promotion was purportedly based only upon the fact that Talerico began reporting directly to Perez, just as plaintiff began doing after Koepke left. Pl.'s Resp. 12, 14. This claim is unavailing. Perez did not unequivocally testify that Talerico was promoted to E-1 only because he reported directly to Perez. Rather, he explained that "the history there is he had actually been hired as an M10 because he originally reported to an E1. That was only temporary. When he began reporting to me he was no longer reporting to an E1, but his–his grade had remained at an M10. So it was actually a re-scoping of the position." Perez Dep. 22. As a practical matter, plaintiff has provided the court with no basis upon which to compare Talerico's position to her own for purposes of discerning whether he could be a viable comparator.[19] Second, it is clear that Perez described Talerico's reporting arrangement at the time of his hiring as "temporary." In contrast, plaintiff's position was intended to report to an E1, but that arrangement was suspended when Koepke resigned and defendants chose not to replace her. When Talecris decided to transfer Bob Brown, a reporting structure approximating the one at plaintiff's hiring was restored as plaintiff began reporting directly to Brown and he to Perez. Third, Talerico was promoted to the E-1 level from the M-10 level, meaning he did not skip an entire level in the promotion process as plaintiff sought to do, and which Haddock testified would be abnormal. Fourth, Talerico had four direct

---

[19] Plaintiff has provided virtually no evidence establishing Talerico's duties and responsibilities relative to her own, other than to assert that they both reported directly to Perez at one point. Where a plaintiff purports to name a comparator for purposes of demonstrating discrimination, "the validity of their prima facie case depends upon whether that comparator is similarly situated. . . . Accordingly, plaintiffs are required to show that they are similar in all relevant respects to their comparator. Such a showing would include evidence that the employees dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010) (citations and internal quotations omitted) (unpublished decision). Even if Talerico and plaintiff are similar in the one respect which plaintiff identifies, it does not follow that Talecrico and plaintiff are similarly situated "in all relevant respects."

reports of his own, Perez Dep. 90, which, Haddock testified, is an important factor in scoping a managerial position. Haddock Dep. 64. Finally, Jack Fan also was an M-10 level employee who reported directly to Perez for some of the same time as plaintiff and was not re-scoped to the E-1 level despite the reporting relationship. Perez Dep. 21. Given all of these circumstances, plaintiff has failed to show that the promotion of Talerico to E-1 somehow constitutes either evidence of discrimination or pretext for discrimination.

Plaintiff's final point of contention respecting Perez's actions during the 2009 reevaluation is that Perez "engaged in deceit in presenting a chart which purported to show the difference between an E-1 level employee and an M-10 level employee but was no more than a comparison of the job of Peter Eisenberg with the job description he prepared for Dara Shoffner." Pl.'s Resp. 13. Plaintiff's argument that this action was deceitful, or that it suggests discrimination or pretext for discrimination, is flawed for many reasons. First, Perez was asked to prepare the chart, using Eisenberg as a basis for comparison, by either his supervisor, Kosinski, or by Ruderman. Perez Dep. 117-18.[20] Thus, the argument that Perez sought to deceive the relevant decision makers by using Eisenberg's unique job description as a general template for E-1 mangers has little traction. Second, it is very likely that the reason Perez was instructed to compare plaintiff's job with Eisenberg's is that plaintiff herself compared her position to Eisenberg's when arguing that she should be promoted to the E-1 level. See, e.g., Haddock Dep. 56. Plaintiff continues to make that comparison in this court, and she acknowledged during her deposition that "[o]ther than Peter Eisenberg, . . . there were not other E-1 level managers that [she] specifically compared [herself] to during this process." Shoffner Dep. 95. Thus, Perez can hardly be faulted for utilizing Eisenberg as a representative of

_____

[20] Kosinski testified that the decision to prepare the chart was reached by consensus during a meeting prior to the meeting involving plaintiff. Kosinski Dep., ex. 9 to Pl.'s Resp.

E-1 level employees where plaintiff herself repeatedly invoked that comparison.

Additionally, plaintiff remains adamant that, not only did she and Eisenberg have "work of equal complexity and similar duties," but that her job actually "was more complex than Peter Eisenberg['s]." Shoffner Aff. ¶¶ 19, 28. Thus, it strikes the court as incongruous for plaintiff to argue, on the one hand, that Perez unfairly and to her detriment compared her job to Eisenberg's while, on the other hand, arguing that her job was at least equal to and, in fact, was more complex than Eisenberg's. Plaintiff does not argue that the position comparison prepared by Perez overstated, embellished, or outright fabricated Eisenberg's duties and responsibilities. Rather, her complaint simply appears to be that Perez "engaged deceit" by proffering Eisenberg's duties as typical for E-1 level managers. However, if plaintiff believes that her job was similar or even more complex that Eisenberg's, and she was afforded the opportunity to make such arguments in front of Perez, Haddock, Ruderman, and Kosinski, then plaintiff should have welcomed such a circumscribed comparison, especially considering that was the comparison she relied upon when addressing these issues with defendants. Accordingly, it is difficult to perceive how any asserted "deceit" by Perez permits any inference of discrimination or otherwise demonstrates pretext for intentional discrimination.

The numerous circumstances identified by plaintiff as illustrative of either discriminatory animus on the part of Perez or of pretext in the decision to not promote her in 2009 are unpersuasive for such purposes. Accordingly, even assuming that plaintiff could satisfy her *prima facie* burden with respect to this claim, she has failed to show that defendants' business judgment that she was not qualified for promotion to the E-1 level in 2009 was pretext for intentional discrimination.

        c.      Plaintiff's application for the Senior Manager Finance - International FP&A position

The final promotion which plaintiff claims she was discriminatorily denied concerns her 2010 application for the Senior Manager Finance-International FP&A position. Although defendants generally argue that plaintiff has not established the third and fourth elements of a *prima facie* case with respect to her failure-to-promote claims, the court finds that, with respect to this claim, plaintiff's *prima facie* burden has been satisfied.[21] Thus, the inquiry turns to whether defendants can produce a legitimate, nondiscriminatory reason for their decision to not promote plaintiff, and whether plaintiff can demonstrated that defendants' proffered reason is pretext for discrimination.

Defendants explain their reason for not promoting plaintiff to the Senior Manager Finance position as follows:

> In 2010, the Company decided to create a new position to fill the trusted business advisor role that had been left undone since Ms. Koepke's resignation. The Company initially posted the new job as a vacant position. At around the same time, a reorganization was occurring in another division called Talecris Plasma Resources which was going to result in the position elimination of Bob Brown, a long term employee. Rather than filling the vacancy through a traditional posting, the Company decided to transfer Bob Brown to the new position. Brown was fully qualified for the position, had many years of experience with Talecris and its predecessor company, and was facing a job elimination.

Defs.' Reply 5. Evidence in the record supports defendants' representations about the circumstances which precipitated the transfer of Brown. See Perez Dep. 46-47; Brown Dep. 17-21.[22] Thus, defendants have produced a legitimate, nondiscriminatory reason for the decision to not promote

---

[21] Defendants do not appear to dispute plaintiff's qualifications for the Senior Manager Finance-International FP&A position at the time the vacancy was announced. Indeed, they represented to the EEOC that plaintiff was encouraged to apply for the position. See August 19, 2010, Letter from Burgin to EEOC, ex. 6 to Pl.'s Resp. Moreover, the position was ultimately filled by Bob Brown, a white male. Thus, plaintiff has likely satisfied the fourth element of the *prima facie* inquiry. Carter, 33 F.3d at 458.

[22] Plaintiff confirmed in her deposition that she has "no reason to believe that [Brown] was not being displaced." Shoffner Dep. 103.

plaintiff.

To show that defendants' reason was pretext for intentional discrimination, plaintiff argues:

Defendants ignored policy and gave the position to Bob Brown who was not as qualified as Plaintiff. The policy clearly states that positions to be filled by employees to avoid displacement, [sic] are positions that are not posted. Once again, a position was posted in Perez's group and when Plaintiff, who was qualified for the promotion and applied, the position was withdrawn from availability so that Plaintiff could not be promoted. Although in there [sic] letter to the EEOC regarding that vacancy Talecris' position was that 'Ms. Shoffner will be given the same opportunity to interview for the role as any other internal applicant.' Ms. Shoffner was not given any interview and Bob Brown was given an interview.

Bob Brown did not apply for the position; he was selected. Bob Brown is not as qualified for the promotion as Plaintiff. This proves that his promotion was pretextual. The irregular selection process used is evidence of pretext. Deviation from regular procedures is evidence demonstrating pretext.

Pl.'s Resp. 15. Thus, plaintiff is attempting to establish pretext by demonstrating that defendants gave the position to someone less qualified than plaintiff and failed to adhere to company policy regarding the filling of posted vacancies.

Plaintiff ultimately fails in her attempt to establish that she was more qualified for the position than Brown, or that defendants materially deviated from some policy in transferring him into the position. Plaintiff claims that she was more qualified than Brown "because he lacked experience working with Sales and Marketing divisions and his background was accounting. The job responsibilities were to support the International Sales and Marketing organization and he did not bring this experience in his financial background to the position." Shoffner Aff. ¶ 34. While Brown did testify that he had no prior experience working with Talecris' international business group prior to his transfer, see Brown Dep. 32, attach. V to Shoffner Aff., plaintiff provides insufficient information about Brown's career and any other experience, aptitudes, or abilities that could have qualified him for the position. At the time of his transfer, Brown had enjoyed a long

career in several different business environments, and had been with Talecris for a number of years. See Brown Dep. 31; Perez Dep. 46-47. As plaintiff purports to compare her qualifications for the position relative to those of Brown, it is incumbent upon her to provide a fuller picture of Brown's supposed lack of qualifications in order to show that there is no justification, other than discrimination, for defendants' decision to transfer Brown into the position.

Plaintiff focuses her challenge to Brown's qualifications on his supposed inadequate experience in dealing with international business, but provides no explanation for her apparent belief that Brown's lengthy career could not have prepared him for the position by, for example, engendering the development of important managerial skills which Talecris might reasonably value just as much as experience with its international business. By focusing on what Brown supposedly lacked instead of what he reasonably could be expected to offer Talecris, plaintiff fails to show that she was more qualified for the position. In any event, even assuming that plaintiff was more qualified than Brown, it is important to note that "Title VII does not require fairness or the promotion of the most qualified candidate; it only prohibits discrimination." Williams, __ F. App'x at __, 2011 WL 5148971, at *1. Without any evidence of discrimination other than plaintiff's own speculation, and lacking a more compelling showing that Brown truly was unqualified for the position, plaintiff has failed to show that defendants' decision to transfer Brown in order to avoid a job-loss was pretext for discrimination against her.

Plaintiff has also failed to show that defendants materially violated some company policy in transferring Brown. The "policy" which plaintiff appears to be referencing states that Talecris may in some instances opt not to post a position vacancy internally, including for "[t]ransfers or demotions that are intended to avoid the displacement, potential layoff or termination of a qualified

26

employee." Job Opportunities Program, ex. 4 to Pl.'s Resp. Plaintiff apparently believes that Talecris' policy somehow forbade it from transferring an employee facing elimination into an already-posted position.[23] However, nothing in the policy provided the court remotely substantiates plaintiff's position. The policy only provides notice of the circumstances under which Talecris might not post a vacancy; it simply does not limit the company's ability to transfer its employees into posted positions. Moreover, plaintiff has not shown that, by applying for the position, she was entitled to any more consideration than what she received prior to the company's decision to transfer Brown. Plaintiff points to no policy mandating that she be granted an interview merely because she applied. Plaintiff has failed to show that defendants materially deviated from any company policy in transferring Brown.

            d.      Conclusion

As set forth above, plaintiff has failed to make even a *prima facie* case of discrimination with respect to some of her failure to promote claims. But even assuming that she has, plaintiff has offered nothing more substantive than her own speculation that the bases for defendants' various decisions to not promote her were pretext for discrimination. Plaintiff's evidence merely establishes her disagreement with the business judgment of defendants on several matters which are firmly within the province of defendants' decision- making authority, including how Talecris structures its grade levels and how it chooses to value the contributions and responsibilities of its employees.

---

[23] Specifically, plaintiff states: "The policy clearly states that positions to be filled by employees to avoid displacement, [sic] are positions that are not posted." Pl.'s Resp. 15. In fact, the policy does not state that. Plaintiff's self-serving reading of the policy would restrict Talecris to transferring its employees facing job loss to only those positions which have not been posted. This would unduly restrict Talecris' flexibility in managing its employees and would actually discourage Talecris from posting all available positions. Given its most natural reading, the policy illustrates the company's reluctance to fill a vacancy without posting the position by apprizing employees of the limited circumstances when it might do so. No objective reading of the policy suggests that it is designed to restrict Talecris from transferring employees facing elimination into positions that have been posted internally.

[T]his showing of a difference of opinion, coupled with [plaintiff's] conclusory allegations of racism [or gender discrimination], cannot reasonably support the conclusion that [any decision not to promote plaintiff] was motivated by racial [or gender] animus. Because, on the one side, there is substantial evidence that the defendants' articulated justifications for [not promoting plaintiff to her desired level] were not pretext for race [or gender] discrimination and, on the other side, there is only [plaintiff's] unsupported opinion that [the failures to promote] was based on improper discriminatory intent, [the court] cannot conclude that she has proffered evidence of pretext sufficient to withstand the defendant's motion for summary judgment on the discrimination claims.

Love-Lane, 355 F.3d at 789 (internal quotations and citation omitted). Accordingly, defendants are entitled to summary judgment on plaintiff's Title VII, § 1981, and § 1983 discrimination claims.

> 2.      Plaintiff's Equal Pay Act Claim.

Plaintiff claims that, "[a]s a female, plaintiff is being denied equal pay for work equal to that of her male counterparts. For example, Peter Eisenberg is a white male supervised by defendant Aldo Perez, who was given the E-1 ranking with all the commensurate pay and other benefits." Compl. ¶ 30. Plaintiff asserts she "was discriminated against with respect to her compensation, terms, conditions, or other privileges of employment," id. at ¶ 47, because she "was paid a lower wage for equal work on jobs, the performance of which requires equal skill, efforts and responsibility." Pl.'s Resp. 22. Defendants contend that plaintiff's EPA claim fails because her "position did not merit an upgrade to the E01 level and her job was not comparable with Eisenberg, who was properly at the E01 level." Defs.' Mem. 19; Defs.' Reply 6-7.

The EPA requires as follows:

No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex[.]

29 U.S.C. § 206(d)(1). As in the Title VII context, the plaintiff is first required to make out a *prima facie* case of wage discrimination under the EPA. To do so, the plaintiff must prove: "(1) that her employer has paid different wages to employees of opposite sexes; (2) that said employees hold jobs that require equal skill, effort, and responsibility; and (3) that such jobs are performed under similar working conditions." Brinkley v. Harbour Recreation Club, 180 F.3d 598, 613 (4th Cir. 1999), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). See also Wheatley v. Wicomico County, Maryland, 390 F.3d 328, 332 (4th Cir. 2004) (emphasis in original) (internal quotations and citations removed) ("To make out a prima facie case under the EPA, the burden falls on the plaintiff to show that the skill, effort and responsibility required in her job performance are equal to those of a higher-paid male employee. In interpreting the EPA, equal means *substantially equal*."); id. at 333 (quoting Brennan v. City Stores, Inc., 479 F.2d 235, 238 (5th Cir. 1973) ("In enacting the EPA, Congress chose the word 'equal' over the word 'comparable' in order 'to show that the jobs involved should be virtually identical, that is . . .very much alike or closely related to each other."). "Once a plaintiff has sufficiently established a *prima facie* case of salary discrimination against her employer under the Equal Pay Act, the burden then shifts to the employer to prove, by a preponderance of evidence, that the pay differential is justified by the existence of one of the four statutory exceptions set forth in § 206(d)[.]" Strag v. Board of Trustees, Craven Community College, 55 F.3d 943, 948 (4th Cir. 1995). Defendant's burden, unlike in the Title VII context, is one of production and persuasion. Brinkley, 180 F.3d at 613.

Plaintiff unequivocally states that Peter Eisenberg is her comparator for purposes of her Equal Pay Act claim. Compl. ¶ 30; Pl.'s Resp. 21-24. She claims that she has satisfied her *prima*

*facie* burden because she was paid less than Eisenberg,[24] her work was equal to his in that it required

at least equal skill, effort, and responsibility,[25] and her reporting structure was similar to Eisenberg's

in that both reported directly to Perez while also reporting to separate Senior Vice Presidents within

Talecris. Pl.'s Resp. 22-23. [26] Defendants argue that plaintiff's position is not equal to

Eisenberg's.[27] They concede that "the individual whose job was most comparable to plaintiff's job

in a general sense was Eisenberg–both plaintiff and Eisenberg performed financial planning and

analysis for his or her respective business unit." Defs.' Mem. 10. Nevertheless, they maintain that

> Eisenberg's role was substantially broader in scope, complexity, and impact on the
> Company. Significantly, Eisenberg managed over $1 billion in revenue while
> plaintiff managed at most $150 million in revenue. This difference alone justifies
> the difference in grade level between Eisenberg and plaintiff. . . . It is self-evident
> that a $1 billion business unit would be more important than a $150 million business
> unit, and it certainly was at Talecris. . . .
> Yet the sizable difference in the amount of revenue managed by plaintiff and
> Eisenberg is not the only justification for their different grade levels. Eisenberg's
> role required him to manage expense control for 165 employees and 41 cost centers
> while plaintiff managed expense control for only 20 employees and 11 cost centers.
> Moreover, Eisenberg's business unit was the entire United States market–the most
> desirable and competitive market in the world. The size and complexity of the U.S.

---

[24] The exhibit the court alluded to *supra* n.5, which includes the title and salary of Perez's direct reports as of April 15, 2010, indicates that, while plaintiff's salary was $106,704 per year, Eisenberg's was $123,352 per year. Exh. 6 to Pl.'s Memo. Notably, Eisenberg was paid less than Debra Chamra, a female, who also was an E1 grade-level employee reporting directly to Perez. Id.

[25] Again, plaintiff actually argues that her job required greater skill and effort than Eisenberg's because he was responsible for the United States market while plaintiff's ICON work required her to perform similar functions for several different international markets. Where Eisenberg worked "with a stable economy, one currency, fixed contracts and routine and structured requests from senior management," plaintiff "had to contend with diverse economies, currencies and political governance." Pl.'s Resp. 23.

[26] Plaintiff's affidavit provides more detail as to why she believes her work was equal to Eisenberg's. She contends that, *inter alia*, they were both "responsible for managing the commercial forecasting, budgeting, and GAAP accounting process on a monthly basis for our respective regions." Shoffner Aff. ¶ 19. She further claims that they both participated "in a month to go meeting where each region's commercial Senior Vice President . . . would discuss sales variances to forecast and budget." Id. at ¶ 21.

[27] In doing so, defendants appear to be arguing that plaintiff has not satisfied her obligation to establish a *prima facie* case of wage discrimination. See Defs.' Mem. 19.

market poses challenges not faced by plaintiff in the much smaller ICON region. Eisenberg was responsible for managing the GAAP accounting process on a monthly basis for commercial rebates, government rebates, and charge-backs. For government rebates, Eisenberg's role involved assessing the utilization trends for produce use by patients where Medicare programs were the ultimate payor. He assessed U.S. sales and inventory levels and determined GAAP accounting for all government Medicaid rebate payments. Plaintiff's ICON region did not involve Medicare or Medicaid or anything resembling these huge government programs. For charge-backs, Eisenberg managed the GAAP accrual accounting for the wholesale acquisition cost ("WAC") process. Plaintiff was not involved in that process in the ICON region. Eisenberg's job was also complicated by the various health care initiatives by state governments and the federal government that did not exist in the ICON region.

Id. at 10-11 (internal quotations and citations omitted); see also Perez Declaration ¶¶ 4-6, ex. 2 to Defs' Mem.

Plaintiff's response to defendants' arguments about the significant gap in economic impact between Eisenberg's U.S. responsibilities and her own with the ICON group is not to deny the existence of the disparity but, instead, to argue that she and Eisenberg performed similar work in their regions and utilized the same mathematic formulas to arrive at revenue figures, but that Eisenberg simply worked with larger numbers when utilizing the same formulas than did she. Shoffner Aff. ¶ 20. She asserts that the complexity of her dealings with international markets and the inability of underdeveloped third-world countries to pay premium prices makes up for "the variance in revenue numbers between Peter Eisenberg US region and my ICON region." Id. She further asserts that her work with "commercial rebates, government tender rebates and discounts, and commissions is similar in complexity and sophistication in ICON." Id. at 19. For example, she claims that both she and Eisenberg "had responsibilities managing GAAP accounting process on a monthly basis," and that they both had "commercial rebates which [they] analyzed the accounting of sales to customers." Id. She contends that both she and Eisenberg were responsible for assessing

31

sales trends and inventory levels when working with rebates, and she equates her management of commission credits Talecris paid to third party brokers with Eisenberg's management of "charge-backs"for wholesalers selling to "third party customers at a lower price." Id. at ¶¶ 23-24. Plaintiff does not appear to address the disparity in amounts of employees and call centers for whom she and Eisenberg were managing expense control or defendants' assertions about Eisenberg's additional tasks in dealing with enormous government programs like Medicare and Medicaid and the various government health initiatives of the state and federal governments.

Despite the parallels plaintiff draws between her work and Eisenberg's, she does not materially or persuasively address defendant's core contention that the size of the U.S. market rendered the scope and importance of Eisenberg's discharge of his duties of greater significance to the company than plaintiff's work with ICON. As defendants argue,

> plaintiff . . . fails to explain why defendants' decision to treat a $1 billion business unit as justifying a higher grade level than a $150 million business unit is somehow evidence of discrimination. Plaintiff's error, among many, is in assuming that effort equates to responsibility. Plaintiff apparently believes that the physical or mental effort required to do a job should be the sole basis for comparing grade levels regardless of the level of responsibility. Plaintiff cites no law to support this conjecture.

Defs.' Reply 4. Indeed, the case law supports defendants' distinction on this basis. "We have explained that jobs do not automatically involve equal effort or responsibility even if they entail most of the same routine duties. Jobs are considered unequal–despite having the same general core responsibilities–if the more highly paid job involves additional tasks which (1) require extra effort . . . (2) consume a significant amount of the time . . . and (3) are of an economic value commensurate with the pay differential." Wheatley, 390 F.3d at 333 (internal quotations and citation omitted). Given the greater "economic value" of Eisenberg's region and the additional tasks he was required

to perform in providing expense control to far more employees and cost centers, as well as dealing with Medicare and Medicaid and state and federal government health initiatives, plaintiff's claim that they were nonetheless "equal" unduly strains the EPA's concept of substantial equality.

Likewise, plaintiff's contention that, while Eisenberg's region generated greater revenue, their positions were substantially equal because they both merely plugged numbers into the same formula and otherwise executed the same functions is flawed. Plaintiff cannot diminish the significance of Eisenberg's responsibilities relative to hers merely by arguing that they performed the same tasks and he simply worked with larger numbers when executing those tasks. Id. at 334 ("It may well be true that all Wicomico County department directors prepare budgets and work schedules. It is certainly not true, however, that all departments have budgets and workforces of equal size."). The region for which Eisenberg was responsible generated several times the amount of revenue of plaintiff's region; Talecris clearly had a much larger economic stake in Eisenberg's work. Thus, even if it can be argued that plaintiff and Eisenberg performed some similar functions in managing their respective markets, the law permits the employer to determine how best to reflect that greater "economic impact" in its payroll. It simply does not follow that "having a *similar* title plus *similar* generalized responsibilities is equivalent to having *equal* skills and *equal* responsibilities." Id. For these reasons, defendants cannot fairly be deemed discriminatory for compensating Eisenberg at a higher level than plaintiff, and, once concerns of gender discrimination are removed, it is not the function of this court to determine whether Talecris struck an appropriate balance in how it compensated plaintiff relative to Eisenberg considering their respective responsibilities. Id. ("Congress did not authorize the courts to engage in wholesale reevaluation of any employer's pay structure in order to enforce their own conceptions of economic worth.")

33

(internal quotation and citation omitted).

Plaintiff has demonstrated that she was a valued employee of Talecris before she resigned. However, she has failed to show that her position was "substantially equal" to Eisenberg's given the far greater economic stake Talecris had in Eisenberg's work, and "it is not the job of the courts to discard Congress' studied use of the term 'equality' and set the price for [her] services." Id. Defendants are entitled to summary judgment on plaintiff's EPA claim.

      3.      Plaintiff's Title VII Retaliation Claims.

Plaintiff alleges that she suffered many retaliatory acts by defendants after she complained that she was discriminated against when defendants failed to promote her. Plaintiff claims the following actions against her were in retaliation for her complaints of discrimination: 1) she "received a negative 'Meets Expectation' rating from defendant Also Perez [sic] as retaliation for her claims of wrongful denial of the requested promotions;" 2) she was "denied her Financial Analyst employee as a result of retaliation;" 3) "on or about May 25, 2010 plaintiff was notified that she would report to a lower level manager;" 4) she was denied the promotion for the Commercial Operations Senior Finance Manager (FP&A) position for which she applied, but which was ultimately filled with Bob Brown; 5) she was subjected to "increased scrutiny, as evidenced by the fact a Talecris's [sic] attorney was observed standing in front of office door in May, 2010;" and 6) "another non-African American employee was promoted to an E-1 managerial level, although plaintiff commenced employment at Talecris before her and at a higher level." Compl. ¶¶ 27-28, 52-55. Defendants assert that plaintiff's retaliation claims fail to establish a *prima facie* case of retaliation and lack merit. Defs.' Mem. 16-18; Defs.' Reply 5-6.

Title VII "prohibits retaliation by a private employer against an employee because she 'has

opposed any practice made an unlawful employment practice' by Title VII." <u>Bonds v. Leavitt</u>, 629

F.3d 369, 384 (4th Cir. 2011) (quoting 42 U.S.C. § 2000e-3(a)).

> To succeed on a retaliation claim, a plaintiff must prove that (1) she engaged in a protected activity, (2) the employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action. . . . An adverse action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits. In addition, [plaintiff] must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

<u>Hoyle v. Freightliner, LLC</u>, 650 F.3d 321, 337 (4th Cir. 2011) (internal quotations and citations

omitted). As with Title VII discrimination claims, "[i]f a plaintiff puts forth sufficient evidence to

establish a prima facie case of retaliation and a defendant offers a non-discriminatory explanation

for his termination, the plaintiff bears the burden of establishing that the employer's proffered

explanation is pretext." <u>Id.</u> Within this framework, the court will consider each of plaintiff's claims

of retaliation.

        a.     Plaintiff receives an "Achieves Expectations" performance evaluation

Plaintiff first claims that "[o]n or about February 26, 2010 [she] received a negative 'Meets

Expectation' rating from defendant Also Perez [sic] as retaliation for her claims of wrongful denial

of the requested promotions." Compl. ¶ 27. She asserts that this "negative" and "adverse"

performance review was "false," and was causally connected to her complaints, beginning around

November, 2009, that she was denied a promotion to the E-1 level because of discrimination. Pl.'s

Resp. 20. Defendants contend that this claim is frivolous, as receipt of an "Achieves Expectations"

performance review is not an adverse employment action and is "not likely to deter a reasonable

person from asserting a claim of discrimination." Defs.' Reply 6 n.5.

The court finds that plaintiff has failed to establish a *prima facie* case with respect to this first alleged act of retaliation. Plaintiff fails to articulate how the performance rating "Achieves Expectations" constituted a significant change in her employment circumstances or benefits. Nor has she shown that a reasonable employee would be dissuaded from complaining of discrimination due to such action by the employer. The "Achieves Expectations" rating is, at worst, a neutral assessment of the employee's performance. Considering the context of the whole evaluation, the rating is more properly regarded as a generally positive, if modest, assessment that the employee is succeeding in his or her job but still has room for improvement. The "Achieves Expectations" designation falls in the middle of a range of five possible performance ratings, which include "Outstanding," "Exceeds Expectations," "Achieves Expectations," "Needs Improvement," and "Unacceptable." Talecris defines "Achieves Expectations" as "Performance and results usually, and in some cases may have exceeded, expectations for achievement of objectives and performance of job responsibilities."[28]

Throughout the relevant evaluation, Perez noted plaintiff's satisfaction of certain objectives and demonstrated competencies, generally finding her to have achieved her objectives and that she was "On Target" with respect to required competencies. See Performance Evaluation Form, ex. 8 to Perez Dep. In the "Overall Performance Comments" section, Perez wrote that "Dara was promoted from senior business analyst to manager as role responsibilities were enhanced. She has been able to adequately handle the increased analytical requirements of the position and deliver on country forecast details. Dara will continue to enhance relationship building with new ICON team members, as well as, beyond her group and continue to refine output." The only arguably "negative"

---

[28] Notably, plaintiff also received an "Achieves Expectations" rating for her performance in 2008, before she had complained of any alleged discrimination. See Performance Evaluation Form, attach. G to Shoffner Aff.

assessment by Perez concerned the individual objective of "Enhance control, reporting over regional cost centers." In that section, Perez wrote as follows:

> Dara has worked closely with the ICON group and made progress to bring more transparency/control over regional cost center spends. The FCA issue represented a failure in our control environment. While not Dara's sole responsibility, she is the last line of defense in controlling the ICON region. She will continue to enhance efforts to monitor ICON business practices and raise potential issues. Work in progress.

Although this assessment suggests some failure that was at least partly attributable to plaintiff and had negative consequences for the company, plaintiff does not address the "FCA issue" and makes no specific argument about how that assessment was "false" or unfair. At bottom, plaintiff appears to believe she received a "negative" and "false" performance evaluation because Perez was not as effusive in praise of her performance as was she.[29] While plaintiff may discern a legitimate dispute about whether Perez undervalued her performance, without a more substantial showing by plaintiff that the "Achieves Expectations" rating somehow constituted an adverse employment action and would likely dissuade a reasonable employee from complaining about alleged discrimination, she has failed to establish a *prima facie* case of retaliation as to this claim.

        b.      Plaintiff's denial of a "Financial Analyst" employee

Plaintiff claims she was "denied her Financial Analyst employee as a result of retaliation for her claims of wrongful denial of the requested promotions." Compl. ¶ 28. She explains that this support position "was written into her 2009 job description" but, after she complained about perceived discrimination, "was no longer made available." Pl.'s Resp. 5. However, it appears that

---

[29] As part of the evaluation process, Talecris employees graded themselves as to each factor listed on the form. A review of the completed form reveals Plaintiff's generally glowing assessment of her own performance, with numerous self-graded "Strengths" as to "Demonstrates Integrity and Ethics" and "Competency Assessment" and related comments. Plaintiff's lone criticism of her performance appears to be that she should "Balance tendency to over-work."

plaintiff is aggrieved not by the complete denial of support personnel, but rather by the provision of only contract support staff: "Plaintiff's designated analyst was removed from the budget for her promotion to the M-10 Level and subsequently a non-permanent, contract analyst was given to her. A contract analyst is hired is [sic] less reliable an employee and is hired as such, because unlike a permanent hire, Talecris is unsure of the ability of the person do to the work." Id. at 19. Defendants contend that this claim is frivolous, as the employment action is not adverse and would not likely deter a reasonable employee from asserting a claim of discrimination. Defs.' Reply 6 n.5.

Plaintiff has failed to establish a *prima facie* case of retaliation with respect to this claim. Whatever plaintiff's opinions about the relative worth of contract and permanent employees, she has not argued, much less actually demonstrated, that the provision of only a temporary contract employee somehow effected a change in her employment circumstances or would otherwise dissuade a reasonable employee from making a claim of discrimination. Indeed, it is difficult to imagine how she could have experienced any adverse "change" in her employment status or circumstances where she did not have a support employee prior to her complaint of discrimination but was provided with one afterwards. Talecris did not take from plaintiff a subordinate employee who had been providing support to plaintiff. Rather, at the time it promoted plaintiff, Talecris decided to create a position to support plaintiff in recognition of her increased importance as the ICON aspect of its business grew. Perez testified that there was some difficulty in getting the position approved in the budget. Perez Dep. 137. Nevertheless, as plaintiff concedes, defendants ultimately were able to provide plaintiff with a contract employee for support. Shoffner Dep. 83. That defendants may have decided to first place a temporary contract employee in this position is

not remarkable, as this is the same tactic used when Koepke resigned.[30]  Talecris' decision to fill a newly created position on a sort of probationary basis with a contract employee without fully committing to the employee as a permanent hire in no way permits the inference that defendants were retaliating against plaintiff due to her complaints of discrimination.  Because plaintiff has failed to show that the provision to her of a temporary employee rather than a permanent employee was "adverse" or otherwise would dissuade a reasonable employee from complaining about discrimination, she has not established a *prima facie* case of retaliation as to this claim.

> c.      Plaintiff's reassignment as a direct report to Bob Brown

Plaintiff claims that "[a]s an example of retaliation, on or about May 25, 2010 plaintiff was notified that she would report to a lower level manager."  Compl. ¶ 52.  She explains that her new supervisor, Bob Brown, was a "lower level E-1 employee" than was Perez.  Pl.'s Resp. 5, 19-20.  Defendants contend this claim is frivolous.  Defs.' Reply 6 n.5.

Plaintiff has failed to establish a *prima facie* case of retaliation with respect to this claim.  Plaintiff cannot show that being required to report to a lower-level executive employee constituted an adverse employment action in that it somehow effected a material change in the terms or benefits of her employment, or that it would dissuade a reasonable employee from making a claim of discrimination.  The reassignment to Brown did not alter plaintiff's duties or responsibilities.  Moreover, plaintiff was not demoted; she maintained her grade level of M-10 after the initiation of the new reporting structure.  Overlooking the curious premise that plaintiff would be aggrieved by

---

[30]   Perez testified that Talecris quickly filled a portion of Koepke's role with a contract employee, and that, ultimately, "Jack Fan actually did a pretty good job on the consolidating side of it, so we made that position a permanent position."  Perez Dep. 46.  Similarly, plaintiff states that she supervised a contract employee, Brendan Hughes, for "[a] little over a year," but that she eventually supervised a non-temporary Financial Analyst, Tuwana Cherry, while at Talecris.  Shoffner Dep. 83.

not being required to continue reporting directly to someone she alleges discriminated against her, the 2010 change in the reporting structure merely reinstated the posture existing at the time plaintiff was hired. Plaintiff began her job reporting to Koepke at the E-1 level and resumed reporting to an E-1 level manager when Brown was transferred into the position that was created to embrace the trusted business advisor role left vacant after Koepke resigned. Finally, as defendants observe, the change in reporting alignment equally affected Jack Fan, who had been reporting directly to Perez but was also reassigned to Bob Brown. Nothing about these undisputed facts permits the inference that plaintiff was retaliated against. Accordingly, plaintiff has failed to establish that the change in reporting structure about which she complains was actually adverse, or that it would somehow dissuade a reasonable employee from making a complaint of discrimination.

     d.  Plaintiff is Denied the Promotion to Commercial Operations Senior Finance Manager (FP&A)

    Plaintiff claims that "another example of retaliation [was that] plaintiff was not considered for the vacancy of International Commercial Operations Senior Finance Manager (FP&A), although she applied for that vacancy." Compl. ¶ 53. Plaintiff argues this failure to promote "is the most egregious form of retaliation that took place here." Pl.'s Resp. 20. Defendants assert that this claim lacks merit because Brown was transferred into the position for legitimate, nondiscriminatory reasons and plaintiff cannot show that those reasons were pretext for retaliation.

    As discussed above, the court has already found that defendants' decision to not promote plaintiff, and instead to transfer Brown into the position, was supported by legitimate, nondiscriminatory reasons, including that Brown was qualified in defendants' judgment, was a long term employee of Talecris, and was facing a job elimination due to restructuring in his division of the company. Thus, even if the court assumes that plaintiff has established a *prima facie* case of

retaliation with respect to this claim, defendants have provided legitimate, nondiscriminatory reasons for the failure to promote plaintiff in this instance, and plaintiff has failed to show that those reasons are pretext for retaliation. Accordingly, defendants are entitled to summary judgment on this claim.

e.    Plaintiff is subjected to "increased scrutiny"

Plaintiff claims that another example of retaliation against her was that she was "placed under increased scrutiny as evidenced by the fact a Talecris's [sic] attorney was observed standing in front of office door in May, 2010." Compl. ¶ 54. Plaintiff claims that the attorney's presence followed her filing of an EEOC charged and was "unprecedented." Pl.'s Resp. 20. She states that the attorney "looked into her office in an attempt to intimidate plaintiff," and analogizes such conduct with "illegal" actions like "surveillance," "intimidation," and "drive-by by management." Id. at 21.[31] Defendants contend that this claim is frivolous. Defs.' Mem. 17; Defs.' Reply 6 n.5.

Plaintiff gives the following account of the incident:

> Retaliation by Intimidation - John Gaither: Since the beginning of my employment in 2007, I had not seen John Gaither, the Executive Vice President, General Counsel and Secretary for Talecris in front of my office door until after I filed the discrimination claim. It is my belief that the company increased their scrutiny of me and my work. I saw him standing at my door and I was behind him. We made eye contact, and he did not say a word. He turned and walked away. At this time, I was the only black female on the second floor on that side of the building out of approximately 30 employees. . . . In every meeting I have attended with Gaither, I have been the only black female present. There has never been a meeting where another black female was in attendance.

---

[31]    The lone case cited by plaintiff in support of her claim that the attorney's conduct amounted to "surveillance" or "intimidation" is Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997). In that case, within a few days of learning that a former employee intended to file a discrimination suit against a police department in the Virgin Islands, the department "commenced an extensive investigation of [the plaintiff] and [the plaintiff's attorney]. This investigation included visual surveillance of [the plaintiff] talking to his attorney, as well as photographs of both [the plaintiff's] home and [the attorney's] Jeep. In addition, . . . the Assistant Director of the National Strike Force ("NSF") of the Virgin Islands ordered a National Crime Information Computer ("NCIC") check of [the attorney]." Id. at 153.

41

Shoffner Aff. ¶ 31.  Plaintiff confirmed in her deposition that she was not actually in her office at the time Gaither was purportedly standing in front of her door and staring into the office.  Shoffner Dep. 97-98 ("I was at the printer, and as soon as I turned the corner, I saw him standing in front of my office door."); id. at 98-99 ("I was behind him[.]").  Plaintiff also confirmed that, while they made "eye contact," the encounter could not have been anything but exceedingly brief.  Id. at 98 ("He was walking and stopped and looked in my office and turned around and kept walking.").  Neither plaintiff nor Gaither spoke during the encounter.  Id.  Plaintiff testified that Gaither never did this sort of "walk by" again, and that no other Talecris attorney did anything "untoward" in the way of acts comprising surveillance, scrutiny, or intimidation.  Id. at 100.

Defendants have submitted a declaration from Gaither in which he disclaims any knowledge of specifically where plaintiff's office was located on the second floor and asserts that he "never went to the second floor to see Ms. Shoffner and I especially never did so to engage in any monitoring or 'scrutiny' of Ms. Shoffner.  I have never engaged in any monitoring or scrutiny of Ms. Shoffner.  I have never stared into or consciously looked into her office."  Gaither Declaration ¶¶ 3-5, ex. 1 to Defs.' Mem.  Gaither surmises that he could have been spotted on the second floor because he sometimes met with other employees, including John Perkins, on the second floor.  Id. at ¶ 4.

While there appears to be a factual dispute about whether Gaither ever consciously peered into plaintiff's vacant office, plaintiff may avert summary judgment only by demonstrating that there is a dispute about a material fact, i.e., one that would likely affect the outcome of the case under governing law.  Simply put, even assuming that Gaither did briefly peer into plaintiff's vacant office and then make eye contact with her before walking away, she has not established a *prima facie* case

42

of retaliation. Given plaintiff's testimony about the circumstances and brevity of this encounter, and her acknowledgment that neither Gaither nor any other attorney at Talecris ever committed any other act she considered demonstrative of the "increased scrutiny" about which she complains, there is simply insufficient evidence that defendants waged a campaign of "surveillance" and "intimidation" to retaliate against plaintiff for her filing a charge of discrimination. Plaintiff cites to no case in which a court has found such a single, fleeting moment of "eye contact" as evidence of retaliatory conduct, and the one case that plaintiff does cite describes actual police surveillance of the complainant's meetings with his attorney and the complainant's and attorney's residences and personal vehicles. Anderson, 125 F.3d at 153. Plaintiff's own description of the alleged scrutiny and intimidating conduct by Gaither pales in comparison. Therefore, plaintiff has failed to establish a *prima facie* case of retaliation owing to purported "surveillance," "intimidation," or "increased scrutiny" after she filed a charge of discrimination.

> f.      The promotion of another employee to the E-1 level.

Plaintiff's final allegation of retaliation is that a "non-African employee was promoted to an E-1 managerial level, although plaintiff commenced employment at Talecris before her and at a higher level" Compl. ¶ 55. Plaintiff explains that Talecris promoted "a lesser ranked employee trained by plaintiff (Adriana Davies) to an E-1 position to humiliate Plaintiff and to chill others from providing support to Plaintiff after Plaintiff's complaint of discrimination." Pl.'s Resp. 21.[32] Her

---

[32] Plaintiff provides a citation to "TAL:00038, Exh. 6" in support of this claim. Pl.'s Resp. 21. As far as the court can tell, there is no "TAL:00038" to be found in exhibit six. TAL:00032 is part of Talecris' response to plaintiff's second EEOC charge and is found in exhibit six. TAL:00032 addresses plaintiff's EEOC claim about the job action involving "Angela Davies" and states, in relevant part, that Davies began her employment with Talecris before plaintiff and that their jobs are too dissimilar for the comparison which plaintiff appears to be making. The only other evidence about the Davies job action which appears in the record is the email from a Senior Director noticing the "promotion" of Davies. See May 20, 2010, email from Jeff Danner, attach. W to Shoffner Aff. While both of these items describe the reasons behind the elevation in grade level awarded to Davies, neither provides even implicit support for plaintiff's
(continued...)

affidavit clarifies that "Davies was promoted to an E1 manager after working in the ICON department for less time than me with no direct reports. I initially trained her and the position became available as the result of the tender process I developed. . . . The growth [of the ICON section] was justification for Adriana Davies to a senior management E1 level position." Shoffner Aff. ¶ 35.

Plaintiff has failed to demonstrate how defendants' promotion of Davies could have been adverse as to plaintiff, or how it would dissuade a reasonable employee from complaining about discrimination. This alone disposes of plaintiff's retaliation claim. Nor has plaintiff provided a sufficient description of Davies' duties relative to her own for the court to even consider whether the promotion of Davies was somehow pretext for retaliation against plaintiff. Davies worked in "commercial operations," not plaintiff's finance part of ICON. Shoffner Dep. 100. It is a novel argument, at best, to assert that Talecris would unjustifiably promote and increase the salary of one employee merely to "humiliate" or somehow retaliate against a different employee with different duties and supervisors. Davies was made the Senior Manager Contracts and Compliance. Plaintiff does not contend that she should have received this position. Plaintiff has provided the court with no evidence that would permit a comparison between the scope, complexity, and responsibilities of the positions of plaintiff and Davies.[33] Accordingly, even assuming that she could establish a *prima*

--------------------------------

[32](...continued)
argument that this was done to "humiliate" her or to "chill" others from supporting her. Once again, it appears plaintiff relies upon mere speculation in order to fill this vital evidentiary gap.

[33] Plaintiff conceded during her deposition that an E-1 level employee in Davies' "commercial side" would have different duties than would an E-1 level employee in finance. Shoffner Dep. 102. Notably, plaintiff did not proffer Davies as a comparator for purposes of her Title VII failure-to-promote claims. This strikes the court as telling, as evidence tending to establish that Davies was similarly situated to plaintiff yet received disparate treatment would have supported her discrimination claims regarding the 2008 and 2009 re-scoping requests as well as her contention that the promotion of Davies was somehow pretext for retaliation against plaintiff.

*facie* case of retaliation with respect to the promotion of Davies, plaintiff has failed to show that such action was pretext for retaliation against her. Defendants are entitled to summary judgment as to this claim.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment (DE # 21) is GRANTED as to all claims. The Clerk is DIRECTED to close this case.

SO ORDERED, this the 16th day of February, 2012.

/s/ Louise W. Flanagan
_____
LOUISE W. FLANAGAN
United States District Judge